FILED
2017 May-17  PM 01:33
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| **MARY JULIA HAND,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION NO.:** |
| **v.** | ) | |
| | ) | _____ |
| **UNIVERSITY OF ALABAMA** | ) | |
| **BOARD OF TRUSTEES,** | ) | |
| | ) | **PLAINTIFF DEMANDS** |
| **DEAN CRAIG EDELBROCK, Ph.D.,** | ) | **TRIAL BY STRUCK JURY** |
| | ) | |
| **LEROY HURT, Ph.D.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

## INTRODUCTION

Plaintiff Mary Julia "Judy" Hand brings this action for legal and equitable relief to redress unlawful employment practices and violations of federal and state law by Defendants University of Alabama Board of Trustees, Dean Craig Edelbrock, Ph.D., and Leroy Hurt, Ph.D.

## JURISDICTION AND VENUE

1.     Plaintiff Judy Hand seeks legal and equitable relief to redress Defendants' violations of her rights secured by:

    a.      Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*. ("Title VII");

    b.      Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.* ("Section 504"); and

    c.      The laws of the State of Alabama.

2.    Federal subject matter jurisdiction exists pursuant to:

    a.      28 U.S.C. §§ 1331, 1343, and 1367;

    b.      29 U.S.C. § 701, *et seq.*, and

    c.      42 U.S.C. § 2000e-5(f)(3).

3.    Venue is proper under 28 U.S.C. § 1391.

## PARTIES

4.    Plaintiff Maria Julia "Judy" Hand (hereinafter "Hand" or "Plaintiff") is a female with a disability over the age of nineteen (19).  Hand has been employed by Defendant University of Alabama Board of Trustees in the College of Continuing Studies in Tuscaloosa, Alabama for eighteen (18) years.

5.    Defendant University of Alabama Board of Trustees (hereinafter "Defendant" or "BOT"), through its member institution, The University of Alabama (hereinafter "UA"), has employed Hand during all times relevant to this lawsuit. Defendant employs more than fifteen (15) people within the meaning of Title VII, 42

U.S.C. § 2000e(b); employs at least fifty (50) persons within the meaning of Section 504; and receives federal funds.

6.    Defendant is an enterprise engaged in commerce or in the production of goods for commerce in that it operates an institution of higher education and engages in an activity of a public agency.  29 U.S.C. § 203(s)(1)(A)-(C).

7.    Defendant Dean Craig Edelbrock, Ph.D. (hereinafter "Dean Edelbrock") is the Dean of the College of Continuing Studies Leadership (hereinafter "the College").  Dean Edelbrock is over the age of nineteen (19) and committed all acts described herein in Tuscaloosa, Alabama.

8.    Defendant Leroy Hurt, Ph.D. (hereinafter "Dr. Hurt") is the Associate Dean, Professional Development and Conference Services of the College.  Dr. Hurt is over the age of nineteen (19) and committed all acts described herein in Tuscaloosa, Alabama.

## NATURE OF ACTION

9.    Plaintiff Hand brings this action against Defendants for acts of intentional sex and disability discrimination, harassment, retaliation and violations of state law that occurred during her employment with the College.  Hand asserts her state law claims against Dean Edelbrock and Dr. Hurt in their individual capacities.

10.     This action seeks to redress grievances resulting from the acts of Defendants, their officers, agents, servants, and employees with respect to Hand's employment; for a permanent injunction restraining Defendants from maintaining a policy or practice of discrimination, harassment, and retaliation of Hand and those similarly-situated on account of sex, disability, or engaging in protected activity; and to return Hand to a position as Program Manager or equal position based on her skills and experience.

11.     Hand seeks all legal and equitable relief to which she is entitled, including costs, interest, and attorneys' fees.  Hand further requests injunctive relief prohibiting Defendants from further illegal discrimination and requiring them to provide training on employment discrimination, harassment, and retaliation, at their cost, for all employees, managers, and trustees of Defendant.  Hand requests further relief as deemed just and necessary by this Court.

## **ADMINISTRATIVE PROCEDURES**

12.     On April 8, 2016, within 180 days of the unlawful acts of which she complains, Hand filed a Charge of Discrimination with the Equal Employment Opportunity Commission (hereinafter "EEOC").  **(See Exhibit A.)**

13.     On February 15, 2017, the EEOC issued Hand a Notice of Right to Sue. **(See Exhibit B.)**

4

14.     Hand has satisfied all prerequisites to bringing this timely action.

## STATEMENT OF FACTS

15.     Hand has been employed by Defendant BOT for eighteen (18) years, beginning in 1999.  Hand began her employment as a Marketing Manager in the Professional and Conference Services Division.[1]  Hand has been promoted twice, first to Marketing and Program Manager, and then to Program Manager.  Hand has also been an adjunct instructor for UA since 1980.

16.     From about 1999 to 2010, Dr. Tom Wingenter (hereinafter "Dr. Wingenter") was Hand's direct supervisor.  Dr. Wingenter consistently gave Hand positive reviews and progressively promoted her to the supervisory position of Program Manager.  As Program Manager, Hand's job description included launching and staffing new programs within the department's budget.

17.     Beginning in approximately May 2012, Dr. Leroy Hurt became the Director of Professional Development and Conference Services.

18.     In 2013, Hand interviewed one male and one female candidate for an instructor position for a new program she developed called The Coaching Academy.  During a conference call with the male candidate and Dr. Hurt, Hand inquired whether the male candidate's requested salary was negotiable.  Following the call, Dr. Hurt

---

[1]In approximately 2012, the division title changed to Community Engagement Division.

criticized Hand for being "too assertive" by asking the male about his pay requirements.   Hand also interviewed the female candidate, who had greater qualifications and a lower pay requirement than the male candidate.   Dr. Hurt pressured Hand to hire the male candidate, even though doing so would overextend the program budget.

19.     After this incident, Dr. Hurt required Hand to undergo "coaching" by a member of the Human Resources Management Planning Committee, about how to "behave" in the workplace.   The member conducted a 360 Degree Interview, whereby she interviewed approximately 6-7 of Hand's co-workers about Hand's personality and workplace behavior.   Hand considered Dr. Hurt's actions as an effort to embarrass her among her colleagues and undermine her authority and reputation.

20.     Hand complained about Dr. Hurt singling her out for adverse treatment multiple times to supervisory and human resources personnel.

21.     On or about September 26, 2013, Hand complained to Gwendolyn Hood, the UA EEOC Representative, that Dr. Hurt discriminated on the basis of gender. Hand provided the example of Dr. Hurt's hiring a lesser-qualified male candidate at a higher rate of pay over the female candidate.   Ms. Hood referred Hand to Mary Nye in Human Resources.   Hand complained in person to Ms. Nye in October 2013 about the same events.

6

22.     In early 2013, Hand hired Michele White on a probationary basis to be her primary support person.  Around November 2013, Hand decided not to continue Ms. White's employment beyond her six (6)-month probationary period based on poor job performance.  Dr. Hurt intervened and refused to allow Hand to terminate Ms. White.  Ms. White was overly-social with Dr. Hurt in the workplace and spent time talking to him rather than completing her work assignments.   Ms. White also blatantly disregarded direct work assignments and instructions from Hand.   Dr. Hurt insisted Ms. White remain employed because she was popular with the staff.  Dr. Hurt then enlisted Sharon Lovoy, a trainer, to "coach" Ms. White and Hand, which undermined Hand's authority over her subordinates.

23.     On or about December 2, 2013, Hand complained to Amy Harvell, Support Staff Supervisor, that Ms. White was not supporting program goals by brazenly refusing her directives, that Dr. Hurt refused to allow her to select her own support staff, and that Dr. Hurt insisted Hand not terminate Ms. White.

24.     In contrast, Dr. Hurt did not restrict other supervisors from making hiring and firing decisions about their support staff.  Dr. Hurt permitted Amanda Bergeron to terminate a support staff employee whose job performance did not meet Ms. Bergeron's expectations.  Ms. Bergeron has no apparent disabilities.

7

25.     Dr. Hurt further undermined Hand's authority in her department by requiring her to relinquish control of the Service Member to Civilian Conference to a new employee, Brenda Truelove, and required Hand to report to Ms. Truelove throughout the planning and execution of the conference.  Ms. Truelove has no apparent disabilities.

26.     Hand has a history of back problems including a diagnosis of severe neural foraminal narrowing which causes compression of her spinal nerve.  Hand initially managed her symptoms with daily exercise and using caution when performing physical activity.

27.     To ease back pain and to improve her mobility, Hand exercised during her lunch break at the UA gym and used a special chair at her desk.  Dr. Hurt began singling Hand out from the other employees by dictating how Hand used her lunch break.

28.     Beginning in approximately April 2014, Dr. Hurt harassed Hand about needing to use the gym during lunch.  Dr. Hurt instructed her, unlike other employees, that she could no longer change clothes at work to go to the gym and ordered her to shower before she returned.  Other employees were allowed to change in and out of gym clothes in their offices.  Hand ultimately gave up using the gym due to Dr. Hurt's scrutiny, which embarrassed and demeaned Hand.

8

29.    Hand's back symptoms became progressively worse until she was forced to undergo back surgery in December 2014.  Hand was required to miss work from approximately December 16, 2014 to January 8, 2015.  Following surgery, Hand underwent physical therapy approximately a weekly until September 2016.

30.    A few months after Hand underwent back surgery in December 2014, Hand began experiencing difficulty with slurred speech, writing, grasping problems, and drooling.  These symptoms became progressively worse in the following months.

31.    Dean Edelbrock became the Dean of the College in about January 2015.  Dean Edelbrock, who was Dr. Hurt's direct supervisor, could readily observe Hand's obvious impairments.

32.    In or around June 2015, Hand's division relocated offices.  Without explanation or justification, Dr. Hurt demanded that Hand relinquish all of her office furniture to a younger, non-disabled employee who was being moved to a private office.  Defendants gave the employee Hand's desk and filing cabinet.  Dr. Hurt also attempted to give the employee Hand's chair.  Hand urged Dr. Hurt not to remove her chair because it was suitable for her physical limitations due to her back problems.

33.    On or about February 9, 2015, Hand requested to meet with Dr. Hurt and Ms. Lovoy to discuss some of the issues she had been experiencing.  During the meeting, Dr. Hurt complained about Hand's son visiting her office between classes.

Hand's son is autistic and had enrolled at UA in 2015. Hand's son made brief, periodic visits to Hand's office to destress between classes. Ms. Lovoy attempted to gain Dr. Hurt's cooperation regarding these visits, but Dr. Hurt remained opposed to Hand's son visiting her. Hand considered this to be nit-picking and another instance of Dr. Hurt harassing her in ways he did not do with other employees.

34.     Dr. Hurt had given Hand positive reviews until 2015. However, in 2015, Dr. Hurt told Hand that he was going to begin evaluating her based on "personality" and not just performance.

35.     On or about August 6, 2015, Hand requested Ms. Nye in Human Resources to meet with her and Dr. Hurt. Hand complained, *inter alia*, that Dr. Hurt undermined her ability to complete a major project by permitting Hand's main support staff person to resign without giving a full two (2)-week notice. The timing of Dr. Hurt's decision was suspect, where Hand only had two (2) days remaining to complete the execution of a new, out-of-town conference. Permitting the employee to resign while Hand was in the middle of a demanding project unnecessarily limited the support Hand had to complete the project, caused logistical problems, and increased Hand's workload.

36.     On or about September 3, 2015, Dr. Hurt issued Hand a write up, falsely accusing her of yelling at another employee. Hurt threatened that, if Hand contested

the write up, he would pressure other employees to agree to be witnesses to the alleged incident.  Hand complained again that day to Ms. Nye about Dr. Hurt's retaliatory conduct.

37.     Hand denies yelling at the other employee.  Even if she had, Dr. Hurt permitted a male employee to frequently scream at female employees in the division without repercussion or disciplinary action.  Female support staff complained up the chain of command to Dr. Hurt on multiple occasions.  Dr. Hurt never met with the male employee about his disruptive and disrespectful workplace behavior until Human Resources demanded that he do so.

38.     In or around September 2015, Dr. Hurt required Hand to share an office for the first time in her employment.  Initially, Hand shared her office with her support staff employee.  Dr. Hurt later required Hand to share an office with Lisa Dunn, whose job was unrelated to Hand's and whose loud telephone conversations booking conference attendees interfered with Hand's ability to communicate via telephone.

39.     On October 7, 2015, Dr. Hurt verbally demoted Hand from Program Manager to Sales Manager without warning or explanation.  In the six (6) months leading up to her demotion, Hand had successfully planned and managed six conferences and had received no disciplinary action.

11

40.    Hand immediately informed Dr. Hurt in person that she had no sales experience with UA and did not expect that she would succeed in sales.

41.    On or about October 8, 2015, Hand complained to Dr. Hurt and Dean Edelbrock that "not only do I lack the self-confidence to be in sales but since my back surgery in December my speech is often slurred and my right leg drags." Hand further explained that her success as Program Manager had "nothing to do with sales and everything to do with long term relationships." She also reported that she was still undergoing physical therapy to deal with what she then thought were nerve effects resulting from her back surgery.

42.    Dr. Hurt continued to insist that Hand be demoted to a Sales Manager position. On or about October 13, 2015, Hand complained to Dr. Hurt and Dean Edelbrock by further clarifying that her physical limitations meant she "would not be a good representative in sales for The University." Hand reminded them that "[a]s you know, my mobility is curtailed right now" and reported that she was scheduled to have additional diagnostic tests and treatment in the future that may improve her walking. Hand requested, "staying in my present formula of bringing in healthy overhead is our best bet. I hope you can be patient with my situation." Despite explaining her physical limitations, Dr. Hurt insisted that Hand be demoted from the Program Manager

position.  Hand understood Dr. Hurt's actions to be further retaliation and an attempt to set her up for failure.

43.     On October 14, 2015, Hand contacted Dean Edelbrock's office to request a meeting to complain about Dr. Hurt's conduct.  Dean Edelbrock refused to meet one-on-one with Hand.

44.     On October 19, 2015, Dr. Hurt instructed Hand to meet with him about transitioning out of her job as Program Manager.  Hand officially became Sales Manager on November 1, 2015.

45.     As Sales Manager, Hand was required to make sales calls in person and by telephone throughout the day.  Hand was unable to successfully make telephone sales calls due to the noise of sharing her office with Ms. Dunn and her increasing difficulty with slurred speech.  Hand was unable to make in-person sales calls without great difficulty due to her lack of mobility, ambulation problems, and difficulty getting in and out of a vehicle.

46.     By transferring Hand to Sales Manager, Dr. Hurt reduced her job responsibilities and opportunities for advancement.  As Program Manager, Hand supervised two (2) employees.  As Sales Manager, Dr. Hurt eliminated all of her supervisory duties.  Dr. Hurt thereafter created a new organizational chart that listed

Hand at the bottom while listing other employees with less seniority and experience above her.

47.    Dr. Hurt replaced Hand by dividing her work between employees with significantly less experience and qualifications than Hand.   Both individuals appeared to be healthy and able-bodied.

48.    Hand continued to request to be transferred back into the Program Manager position because the position was more suitable to her physical limitations. Hand applied for another open Program Manager position that became available under Dr. Hurt, but Dr. Hurt refused to consider Hand.

49.    Hand then applied for a Program Manager position in a different division and interviewed for the position.  A male employee with no apparent disability was selected over Hand.  Dr. Hurt and that division's Director regularly met prior to the decision to hire the male candidate.

50.    According to the Sales Manager job description, Hand's goals were to "increase and diversify revenue in the Additional Revenue category for non-credit programs by cultivating new sources, increasing revenues from existing sources, and innovatively diversifying revenue sources."  "Additional Revenue" sources include "exhibitors, sponsors, grantors, donors, and UA partners."   In essence, the Sales

Manager operated as a fund-raiser for UA programs in the College of Continuing Studies.

51.     In October 2015, Dr. Hurt instructed Hand that her focus as Sales Manager should be on bringing additional income into the College via sales.  Hand requested Dr. Hurt provide more specific direction in meeting his expectations.  Dr. Hurt told her to use the Greta Schultz training methods, which Hand did.

52.     Over the next several months, Hand scheduled meetings with Wells Fargo to discuss an endowment proposal, worked with Regions Bank to set up a stewardship program to support a lecture series, and began working on a $75,000 proposal with HealthSouth to support multiple programs, including providing $15,000 for UA's 15th Annual Autism Conference.

53.     Dr. Hurt failed to convey to Hand that before seeking more than $10,000 from fund-raising partners such as HealthSouth, she was required to seek prior approval from Dean Edelbrock and the Director of Development.  As a result of Dr. Hurt's neglecting to inform Hand of the protocol, she was unable to obtain the correct review of her fund-raising efforts prior to reporting them to her supervisors.  Hand considered this to be further retaliation by Dr. Hurt and an attempt to diminish her reputation among her superiors.

15

54.    Dr. Hurt began requiring Hand to meet with him weekly to discuss her progress.  Hurt told Hand to limit her fundraising to selling at exhibit booths and seeking low-level sponsors under $10,000, which were already being handled in the Marketing Department.  Hand considered this to be Dr. Hurt's effort to further minimize her job duties and set her up for failure.

55.    In November 2015, Dr. Hurt again alleged that Hand's visits from her son were disruptive.  Hurt failed to follow UA protocol to provide assistance to an autistic UA student by contacting the UA-ACTS phone number.  He instead required Hand to sign an acknowledgment that visits by her son violated the employee visitor policy and forbade his future visits to Hand's office or the building lobby, which is a public space. Dr. Hurt did not require any other employees to eliminate visits by friends or family, especially those who were UA students.  Dr. Hurt took steps to embarrass Hand's son for needing to visit Hand at work.  Hand understood this to be further retaliation and further effort by Dr. Hurt to create a hostile environment.

56.    Dr. Hurt continued to undermine Hand's ability to succeed by arbitrarily changing her goals and job duties.  For example, after Hand informed Dr. Hurt of her significant progress in bringing in additional income into the college via sales, Dr. Hurt instructed Hand that her focus should no longer be in making sales, but in securing

grants for the College.  Hand then attended a two (2)-day grant writing workshop in Huntsville and a four (4)-day grant writing training in Atlanta.

57.    In approximately August 2016, Hand began drafting a grant proposal for the Department of Health and Human Services.  Hand submitted the draft proposal to UA's Sponsored Programs and Grants Department and provided Dr. Hurt with a copy. Dr. Hurt then announced that he wanted a younger, non-disabled person to head the program who had less experience than Hand in program management.  However, because that employee's workload was too heavy to take on the additional program at the time, Dr. Hurt's actions caused Hand's efforts to secure grant funding needless. Hand considered this to be yet another action by Dr. Hurt to diminish her responsibilities and force her to resign.

58.    Dr. Hurt continued to change Hand's job duties and goals.   Following Hand's mid-year 2016 evaluation, Dr. Hurt drafted a new set of unreasonable goals to increase revenue by $350,000.  Dr. Hurt did not require this of any other employee except for Hand.

59.    Hand began diagnostic treatment for Parkinson's disease in December 2016, and received an official diagnosis in January 2017.  Hand advised Dr. Hurt of her diagnosis.

17

60.     Since December 2016, Hand has taken medication to lessen her Parkinson's symptoms, but they continue to affect her communication and mobility. Between 2014 to the present, Hand's back condition and the Parkinson's disease have caused progressive difficulty with Hand's mobility, ambulation, speech, and getting in and out of vehicles.

61.     Dr. Hurt consistently hired significantly younger, non-disabled employees to work under his supervision.  None of those employees had mobility problems.  Dr. Hurt hired one such employee as a Program Manager despite that employee's not having a Master's degree, as required in the job description.

62.     Despite Hand's numerous complaints, Defendants BOT and Dean Edelbrock failed to investigate or remedy the discrimination, harassment, and retaliation.

63.     Defendants negligently and wantonly hired, trained, retained, and supervised persons in positions of authority who caused Hand to suffer from discrimination, harassment, and retaliation.

64.     Hand continues to suffer from ongoing discrimination, harassment, and retaliation as of the filing of this lawsuit.

18

## COUNT ONE

## TITLE VII - SEX DISCRIMINATION AND HARASSMENT AGAINST DEFENDANT UNIVERSITY OF ALABAMA BOARD OF TRUSTEES

65.     Hand realleges and incorporates by reference paragraphs 1-64 with the same force and effect as if fully set forth herein.

66.     Hand is female and a member of a protected class.

67.     Defendant BOT, by and through its agents, subjected Hand to unequal and less preferential terms and conditions of employment, including pay, in comparison to similarly-situated males.

68.     Dr. Hurt disciplined Hand for alleged misconduct for which he failed to discipline similarly-situated male employees.

69.     Dr. Hurt criticized Hand's legitimate interview question of a male candidate's salary requirements as being "too assertive."  Dr. Hurt then pressured Hand to select the male candidate, who had fewer qualifications and required a higher rate of pay than the female candidate, causing Hand's program budget to be overextended.

70.     Dr. Hurt continually undermined Hand's authority among her subordinates, whereas he did not undermine the authority of similarly-situated males.

71.     Dr. Hurt completely Hand's supervisory responsibilities whereas he did not remove those duties from similarly-situated males.

19

72.     Defendant selected male candidates with lesser qualifications or experience for open positions over Hand.

73.     Following Hand's complaints about Dr. Hurt's discriminatory treatment, Dr. Hurt demoted Hand from Program Manger to Sales Manager.

74.     Defendant subjected Hand to severe or pervasive harassment and a hostile work environment based on sex.

75.     Hand complained to numerous members of management and Defendant's EEO and Human Resources Departments.

76.     Defendants failed to investigate or remedy Hand's complaints.

77.     As a proximate result of Defendant's unlawful discrimination and harassment, Hand has suffered financial loss, loss of career advancement, shame, humiliation, emotional distress and trauma.

78.     Hand seeks declaratory and injunctive relief, and all legal and equitable relief available including lost wages and benefits; pecuniary and non-pecuniary compensatory damages for loss of career opportunities, humiliation, embarrassment, and mental anguish; costs, interest, and attorneys' fees; and such other and further relief the Court deems necessary and proper.

## COUNT TWO

### SECTION 504 - DISABILITY DISCRIMINATION, HARASSMENT, AND FAILURE TO ACCOMMODATE

### AGAINST DEFENDANT UNIVERSITY OF ALABAMA BOARD OF TRUSTEES

79.    Hand realleges and incorporates by reference paragraphs1-64 with the same force and effect as if fully set out in specific detail herein below.

80.    Hand is a qualified individual with neural foraminal narrowing and Parkinson's disease.

81.    Hand's disabilities substantially limit one or more major life activities or bodily functions.

82.    Hand had a record of or was regarded as having a disability.

83.    Hand had progressively worsening problems with her mobility prior to her back surgery in 2014.   Shortly after Hand's surgery, she began having difficulty speaking clearly and her right leg began to drag, which visibly affected her mobility. These physical problems were noticeable to anyone who encountered Hand.

84.    Hand informed Dr. Hurt of her back condition prior to December 2014.

85.    Dr. Hurt began to harass Hand about using her lunch hour to exercise as a means of managing her back symptoms and improving her mobility.

21

86.     Following Hand's surgery, her ambulation, arm and hand mobility, writing ability, and ability to speak clearly continued to decline.

87.     Hand was able to perform all essential functions of her job as Program Manager without accommodation.

88.     Hand informed Dr. Hurt and Dean Edelbrock in or about October 2015 that her medical conditions prevented, or at least significantly limited, her from performing the primary functions of the Sales Manager position.

89.     Defendant nonetheless removed the reasonable accommodation of the Program Manager position and demoted Hand to Sales Manager.

90.     Defendant denied Hand the opportunity to be transferred back to the Program Manager position on at least two occasions, despite her many years of good performance in that job.

91.     Defendant instead hired non-disabled employees who lacked the requisite Master's degree, had far less seniority, and/or were far less qualified than Hand for the Program Manager positions.

92.     Defendant is a recipient of federal funds.

93.     Defendant BOT, by and through its agents, subjected Hand to unequal and less preferential terms and conditions of employment, including pay, in comparison to similarly-situated non-disabled employees.

94.    Hand has been subjected to severe or pervasive harassment because of her disability.

95.    Defendant has denied Hand a reasonable accommodation for her known disability despite her request.

96.    As a proximate result of Defendant's unlawful discrimination, Hand has suffered financial loss, loss of career advancement, shame, humiliation, emotional distress and trauma.

97.    Hand seeks declaratory and injunctive relief, and all legal and equitable relief available including lost wages and benefits; pecuniary and non-pecuniary compensatory damages for loss of career opportunities, humiliation, embarrassment, and mental anguish; costs, interest, and attorneys' fees; and such other and further relief the Court deems necessary and proper.

## COUNT THREE

**RETALIATION**
**TITLE VII AND REHABILITATION ACT**

98.    Hand realleges and incorporates by reference paragraphs 1-97 with the same force and effect as if fully set out in specific detail herein below.

99.    Hand exercised her statutory rights under Title VII and the Rehabilitation Act by complaining about discrimination and harassment to her superiors and Defendant's EEO and Human Resources Departments.

23

100.   Defendant, by and through its agents, retaliated against Hand by subjecting her to a hostile work environment after she complained.

101.   Defendant, by and through its agents, retaliated against Hand by demoting her after she complained.

102.   Defendant, by and through its agents, retaliated against Hand by refusing to offer her a reasonable accommodation after she complained.

103.   Defendant, by and through its agents, retaliated against Hand by undermining her authority with her subordinates.

104.   Defendant, by and through its agents, retaliated against Hand by removing her supervisory duties.

105.   Defendant, by and through its agents, retaliated against Hand by removing and minimizing her job responsibilities and chances for advancement.

106.   Defendant, by and through its agents, retaliated against Hand by materially altering the terms and conditions of her employment.

107.   As a proximate result of Defendant's unlawful retaliation, Hand has suffered financial loss, loss of career advancement, shame, humiliation, emotional distress and trauma.

108.   Hand seeks declaratory and injunctive relief, and all legal and equitable relief available including lost wages and benefits; pecuniary and non-pecuniary

compensatory damages for loss of career opportunities, humiliation, embarrassment, and mental anguish; costs, interest, and attorneys' fees; and such other and further relief the Court deems necessary and proper.

## COUNT FOUR

### NEGLIGENCE

### AGAINST DEFENDANTS EDELBROCK AND HURT

109.   Hand adopts and realleges paragraphs 1-64 as if fully recited herein.

110.   This is a claim arising under the laws of the State of Alabama to redress Defendants' negligence which proximately harmed Hand and caused her to suffer damages.

111.   Defendants had a duty to provide a non-discriminatory, non-hostile, and non-retaliatory work environment to Hand and other employees.

112.   Defendants negligently hired employees who were unqualified and/or unwilling to provide a lawful work environment to Hand and other employees.

113.   Defendants had actual notice of Hand's complaints of discrimination and harassment.

114.   Defendants, having such knowledge, negligently and wantonly failed to train and discipline those employees who actively interfered with Hand's lawful rights under Title VII and the Rehabilitation Act, discriminated against her on the basis of sex

25

and disability, and retaliated against her for asserting her lawful rights under those Acts.

115.   In doing so, Defendants failed to protect Hand from further injury.

116.   Defendants negligently failed to administer their own policies against discrimination, harassment, and retaliation and failed to regularly and clearly communicate such policies to their managers and employees.

117.   Hand's working conditions created by Defendants were adverse and hostile and intended to cause Hand financial, physical, or emotional harm.

118.   As a proximate result of Defendants' unlawful conduct, Hand suffered adverse terms and conditions of employment, severe emotional distress, physical pain and suffering, humiliation, mental anguish, trauma, embarrassment, and financial loss.

119.   Hand seeks declaratory and injunctive relief, an award of lost wages and benefits, compensatory damages for loss of career opportunity, humiliation and embarrassment, and mental anguish, costs, interest, attorneys' fees, and any and all such other relief the trier of fact may assess.

## COUNT FIVE

### INTERFERENCE WITH CONTRACTUAL OR BUSINESS RELATIONS

### AGAINST DEFENDANTS EDELBROCK AND HURT

120.     Hand realleges paragraphs 1-64 as if fully set forth herein.

26

121.     Hand had established business relationships with her coworkers and colleagues.

122.     Defendants had knowledge of these business relationships and sought to intentionally damage them to Hand's financial, physical, and emotional detriment.

123.     Defendants intentionally placed Hand in a false light among her coworkers and colleagues and intentionally sought to harm her professional reputation.

124.     Hand was damaged as a result of Defendants' intentional interference.

125.     As a proximate result of the Defendant's conduct, Hand was caused to suffer loss of employment wages and benefits, physical injury, pain and suffering, embarrassment, humiliation, loss of reputation, loss of career opportunity, emotional distress, trauma, and mental anguish for which she claims damages as set out below.

126.     Hand seeks declaratory and injunctive relief, reinstatement, award of compensatory and punitive damages, mental anguish, costs, interest, attorneys' fees, and any and all such other relief the trier of fact may assess.

**WHEREFORE, Plaintiff respectfully requests this Court:**

A.     Grant a permanent injunction enjoining Defendants, its officers, successors, assigns, and all persons in active concert or participation with it, from engaging further in discriminatory treatment on the basis of sex, disability (both actual and perceived), and retaliation based on protected activity;

27

B.      Order Defendant to institute and carry out policies, practices, and programs that provide equal provisions and employment opportunities for all employees, and which eradicate the efforts of past and present unlawful employment practices, including implementing a policy against sex and disability discrimination and against retaliation for engaging in protected activities;

C.   Order Defendant to make Plaintiff whole by providing equitable relief, lost wages and benefits, costs, interest, and other affirmative relief necessary to eradicate the effects of its unlawful employment practices, including, but not limited to, compensatory, punitive, and liquidated damages;

D.      Award Plaintiff compensatory and punitive damages;

E.      Award Plaintiff costs and expenses herein, including reasonable attorneys' fees; and

F.      Award such other and further relief this Court deems just and proper.

**PLAINTIFF DEMANDS TRIAL BY STRUCK JURY**

Respectfully submitted,

*/s/ Alicia K. Haynes*
Alicia K. Haynes
ASB-8327-E23A

*/s/ Sonya C. Edwards*
Sonya C. Edwards
ASB-8848-S73E
Attorneys for Plaintiff

28

**<u>OF COUNSEL:</u>**

**HAYNES & HAYNES, P.C.**
1600 Woodmere Drive
Birmingham, Alabama 35226
Phone: (205) 879-0377
Email: akhaynes@Haynes-Haynes.com
        scedwards@Haynes-Haynes.com

**PLEASE SERVE THE FOLLOWING DEFENDANTS
BY CERTIFIED MAIL:**

University of Alabama Board of Trustees
c/o Office of President
Dr. Stuart R. Bell
Box 870100
Tuscaloosa, AL 35487

University of Alabama Board of Trustees
c/o: Michael Spearing
Katie B. Thompson
Box 870106
Tuscaloosa, AL 35487

Dean Craig Edelbrock, Ph.D.
College of Continuing Studies
Box 870388
Tuscaloosa, AL 35487-0388

Associate Dean Leroy Hurt, Ph.D.
College of Continuing Studies
Box 870388
Tuscaloosa, AL 35487-0388

**PLAINTIFF JUDY HAND'S ADDRESS:**

Ms. Judy Hand
c/o Alicia K. Haynes and Sonya C. Edwards
Haynes & Haynes, P.C.
1600 Woodmere Drive
Birmingham, Alabama 35226